May it please the court, Marissa Conroy on behalf of the appellant Miguel Ramirez. Runners, this case was a case about an individual charged with one count, felon in possession of a firearm. And instead the trial turned into a proceeding in which there was numerous testimony regarding Armenian power, its members, the crimes they committed, the types of behaviors they engaged in, which completely denied Mr. Ramirez a fair trial. Now essentially the prosecutor, through their primary witness agent Stebbins, introduced testimony first of all regarding Armenian power, who they were, what they did, that they were not only a organization that engaged in white collar crime fraud, but also in murders, kidnapping, extortion, and they had ties to international groups. None of this was relevant to the fact of whether Mr. Ramirez knowingly possessed a firearm. Yeah, I'm very sympathetic to your point of view here. There's an awful lot of stuff in here that really is quite irrelevant to whether or not he was possessing a firearm. The objections at trial were fairly limited. I'm not sure whether I'm really looking at this as plain error or whether there was some sense of a sort of a broad objection because of the objections that were made, but even assuming the evidence came in impermissibly, and even though the evidence against your client is circumstantial, the evidence seemed to me awfully strong. I would disagree, respectfully. I think what we have here are several phone calls, one that might have somewhat specific language as to a firearm, but the rest were rather general and vague. I have some things, I'd like to bring something by, and so we have those calls, but we have no one witnessing Mr. Ramirez actually possessing these guns, carrying these guns into the shop where everyone met. We don't have anyone witnessing the guns coming out, and the guns are then subsequently found. The statement was a little more specific than that. I believe there's one phone call in which he referenced, I have a firearm with a little one on the something, which would indicate it was a gun, but the other conversation... What else could it be? Well, I'm saying... I mean, it doesn't take much. I mean, you have a statement like that. The jury hears that he talks about the little thing without the singing hammer. It's clearly talking about a firearm. And then it matches one of the firearms that's recovered. Right, but the other problem is we had outside testimony come in that, I believe, on approximately 10 occasions was the testimony, Darbinian had received firearms from other people during this entire duration of time, too. So that doesn't necessarily mean that this particular firearm that was found in this other vehicle was the firearm that Mr. Ramirez possessed. In regards to the other evidence... You do agree with Judge Fletcher's characterization, there was no objection here, right, to any of these things coming in? Well, there were objections to some things that were sustained, and then there were other things that were not objected to. So that's correct. Well, okay. The ones that were sustained were sustained. You can't appeal from those, right? No, but the problem in terms of... Well, I don't know. I'm just trying to parse out how we judge any error. So the things that were objected to and were sustained, you can't appeal that, right? So it has to be the things that were not objected to that you are now... Which were raised in the brief, correct. Those were the items that... So is there any doubt that we have to review those under plain error? I think the standard, based on the arguments that I've raised, would be plain error. But I would submit that we could establish plain error. Pretty steep standard. I agree. I mean, this is something where his lawyer is there with him and stands mute, and we have to say that this is a court error by not suppressing that or not excluding evidence on his own, right? Right. But there were, as I pointed out in my brief... I mean, that's the standard, right? That is the standard. That's correct. But I pointed out in my brief, if the court isn't inclined to accept the argument that all of this argument regarding Armenian power and the members of the gangs and the crime that they were engaging in is enough, the fact that Agent Stebbins, who was primarily the government's source of evidence in this case, it testified that Mr. Ramirez was guilty through a number of statements. And so if you take those cumulative errors together, especially, I do believe it would rise to plain error. This was a one-count charge. It was felon in possession of a firearm. Typically, felon in possession is... It's shooting fish in a barrel, meaning felon in possession is not very hard to prove. And even though this one is circumstantial, it seems to me that the proof here is fairly overwhelming. I guess that's where I would disagree, especially in light of the fact that there was evidence that Armenian power dealt in firearms trafficking, and there were other guns. And so, according to... I would be more sympathetic to the argument, this evidence not overwhelming, if we didn't have the oddity of his having described the gun as missing the hammer, and then it turns out that that's the characteristic of the gun that's found. That makes sense. The problem is, I don't know how common that particular gun is, and that evidence is not in the record. Well, not just that gun, but the fact that this gun is not actually operative because of that problem. It's missing something. Right. I understand. With that in mind... Counsel, if I could ask you a question. Yes. If there was an error in not sua sponte, excluding something to which there was no objection, then is the harmless error analysis would have to take into account all the evidence that came in without objection, right? I'm sorry, I'm not quite following the question. Well, if you're contending that the judge made an error by not sua sponte, excluding some evidence on which there hadn't been objection, and if we agreed there was an error in not sua sponte, excluding the evidence, then returning to whether it affected your client's substantial rights or whether there was harmless error, wouldn't we have to consider all the evidence that was properly admitted in assessing that? I think the answer is yes. I think that that would be the answer to your question. Okay. And in that evidence that was properly admitted, that includes a lot of things that might have been of similar character to what you're objecting to, but which weren't objected to. So the jury would have heard those other things that weren't objected to. That's correct. Okay. Okay, thanks. Also, you commented in arguing the evidence wasn't definitive, that your client often said things like, I have things to bring by, or used general terms like that. Don't some people dealing with drugs or guns use code words on the phone? That is correct. But oftentimes what that requires is an agent will testify as to what the meaning of those code words potentially are, which then brings in testimony explaining what those words are. And this is just an aside. I did point out in my brief that Agent Stebbins did serve a dual role here. He served as both an expert and a lay witness, and there was not an instruction given to the jury as to how to evaluate his testimony in that regard. Okay, thank you. Thank you very much. And with that, I'd save one minute for rebuttal. Thank you. Okay, we'll hear from the government. Good morning, Your Honors. May it please the Court, Kerry O'Neill, on behalf of the United States. I'll address these allegations that we've been discussing initially. I think the Court is right that plain error review applies here. I think initially the Court has to examine whether or not there was plain error rule 403 in terms of evidentiary error. And that is a very difficult test to meet under risk. Indeed, this Court said it is the rare exception when a district court's decision to admit evidence under Rule 403 constitutes plain error. This case is not that rare exception, given the strength of the circumstantial evidence that the government presented, given the use of the word snub-nose in the calls, then the finding of the snub-nose gun thereafter. Moreover, a lot of this evidence, which defendant absolutely did not object to at all, this contextual background evidence. There were some objections for speculation when Agent Stebbins was testifying that defendant now claims that amounted to vouching, but there was no vouching objection. But in terms of this background contextual evidence about what was Armenian power, what did it do? Was it a type of gang? And I'm praising it in a manner that actually the prosecutor did not, because the questions were more open-ended. But essentially, was it the type of gang that engaged in firearms trafficking? All of that was contextual evidence totally unobjected to by the defendant. There was no motion in limine, there was no objection at trial, there was no request for a sidebar, there was no motion for a new trial. And the reason why is because the parties understood, especially in this specific felon in possession case, that context was important. And this felon in possession cases, in part because they are not always so easy to prove, that contextual background information, the government is allowed to elicit it. I'm not sure I understand that argument. Why does it matter who he sold the gun to? I mean, let's say the person he sold the gun to was just some private citizen who wanted to carry a firearm for protection, maybe illegally, maybe with a carry permit, or just keep a gun at home for home protection. What difference would that have made? I'm not sure why the context matters. Because I think here, Your Honor, as we've all stated, this was a circumstantial case. So the context did matter because this defendant was not ever caught or seen with a gun in his hand. So what we have is the overlay of the wiretap calls, and there is some need to explain to the jury why Defendant Ramirez, not an Armenian power member, would even be caught on these calls with Darbinian, one of the number one Armenian power bosses. But the jury doesn't know they're Armenian. I mean, Armenians don't sound any different from anybody else, best I can tell. I mean, you can't say, oh, those are Armenians. No, no. And that, it doesn't really matter what type of... But that's the point. It doesn't matter. I mean, he gets caught on tape, on conversation that sound like he's selling guns to somebody. Does it matter whether it's the person is a drug lord or is a head of some criminal organization, or alternatively, that it's a private citizen who just wants to buy a gun? Does it make any difference to the felon progression chart? Does it make it any more credible? I think it does here, because what also happens, what we have are the subsequent actions. So the defendant is never even seen dropping off the guns at Kazbayan's weed shop. He's not seen coming out of the weed shop. What we have to then explain is our burden of proof, is how then were all these other individuals involved? How did that gun, or those guns, because there were three of them, get from Kazbayan's weed shop to Sarah Boyan's father's trunk, the Mercedes? And so this is a felon in possession case, yes, but it has many moving parts and moving players. It just so happens that those moving parts and moving players existed within this Armenian power organization. But that is the context in which the defendant was dealing. And I think, Your Honors, we have to go back to the fact that none of this was objected during the trial. And I quarrel with the characterization that it was an overwhelming amount of evidence. The government never, excuse me, an overwhelming amount of improper evidence the government was putting in with the background contextual information. We didn't argue that these guns were used then later for any murders, as the defendant suggests in her reply brief. We didn't say that defendant was involved in any other criminal activity besides what we were alleging to be this gun-dealing relationship. But selling or attempting to sell guns to a crime boss, to somebody involved in organized crime, is quite, you know, a different, I'm sure, in the jury's mind than selling a gun to just a private citizen who wants to have a firearm in the house for self-protection. You know, if you have the one kind of sale, you are then setting up a situation where the gun can and very likely will be used for that purpose. And I just don't see the purpose of that, how it helps the government's case to give that inference, how it helps persuade them, yes, he was the guy who possessed the gun. I'm not seeing how that helps legitimately. Because I can certainly understand how it helps. I can understand very well. Well, I think that most definitely there is the proper motivation here. The government has to have a theory of its case. And the theory of the case here, the only... Why is there a theory of its case? He tried to sell it to this guy, this guy had somebody else went and looked at it, his guy, we don't know what his purposes were, and then he sends this other guy, and they all have Armenian names, but maybe that's because Armenians, you know, so if you're dealing with, let's say, people, Mexican descent, you know, they'll all be, you know, all their friends, maybe. There's no implication of being Armenian that you are involved in organized crime. No, and I think what the court is getting to is something... There's always going to be a little bit of prejudice in these types of cases, given the type of crimes that we are prosecuting. And that's where... I guess, I'm sorry, I know. What I'm wondering is, I can see only prejudice. I am trying to get out of you, what non-prejudicial purpose is there for that information? The prejudice part, and I understand sometimes you have stuff that's relevant, that's helpful to legitimately prove in the case, and you also have prejudice, and you just have to put up with the prejudice because, you know, that's the way it goes. But what is the legitimate purpose of teaching the jury that this gun will likely be used to intimidate, kill people, you know, that we used to... There's no legitimate purpose. Well, I push back on that characterization. That wasn't an argument ever made in closing. What is the point? But the legitimate purpose... If this is an organized crime group, that's what they use guns for. They don't use it just as ornaments on the wall. The clear implication, when you're selling to an organized crime group, is that when they use it for a legal purpose, for killing, maiming, intimidation, that kind of stuff. Okay, first of all, this was the context in which the crime took place. Number two, the probative value of this evidence is that it explains the actions of the defendant. It explains his communications with this person, and then why Darbinian would be instructing other people to hold onto the guns, to pick up the guns. It explains the interworking of what otherwise looks like a conspiracy, what otherwise sounds like, walks like, talks like a conspiracy. The government has an obligation, in proving its case, to explain the different moving parts. It was no intent to smear. This is the fact of the matter. This was the organization that he was dealing with. If it had been a different organization, so be it. But I think there are some things that we cannot change in terms of the nature of the crime that's being committed. The probative value is that it explained the series of steps that occurred and how the law enforcement officers then found the weapons. And those steps could not have been explained without talking about the fact that this is an Armenian organized crime organization. You couldn't have done the explanation and said, that's part of a doubt, that they are an organized crime group. That was sort of inextricably intertwined. That's the government's argument, that it's inextricably intertwined. And I think even if this court doesn't believe that, even if this court thinks the government could have fully proven its case without any of this background contextual evidence, the vast majority of which the government believes was probative and relevant and not unduly prejudicial, the fact still remains that the defendant hasn't shown a miscarriage of justice, which is what he has to show under the plain error test here. Indeed, subverting the defendant's argument that there was a miscarriage of justice was his own reliance, in closing, on this very same background contextual information. He used it to craft his defense. That was his defense. In fact, on cross-examination of Agent Stebbins, he asked him, didn't this organization deal with other firearms specialists? Wasn't Darbinian caught on the wiretaps distributing guns to other people? He then used that, in closing, to argue, my guy, my defendant, was not the firearms specialist in this case. So even if this court isn't persuaded that there was no error, that's only prong one and prong two of the plain error test. Defendant simply cannot satisfy prong three and four. There was no substantial effect on his rights. There was no miscarriage of justice. The prosecutor most avowedly did not argue these background contextual effects. Come a long ways from your beginning, where you said, boy, this is so hard to prove, our evidence was thin. Well, the Court pushed me that way. We really need it. You've come a long ways. Well, but I think ultimately we have to walk through all of the steps. And so, you know, no one's going to concede at prong one. But the government's position — Your best argument is they didn't object. But if there had been an objection here, I'd have serious doubts about this. I understand, Your Honor. If the Court has no further questions about the wiretap, I'll submit. Thank you. Thank you. Would you like to take a minute for rebuttal? This was a felon in possession of a firearm case. And as Your Honor stated, it doesn't matter who he sold the guns to. And by incorporating the Armenian power — I think counsel didn't object. I mean, I guess I'm asking, you know, it's more of a rhetorical question. There was no IAC claim yet. Not on direct appeal, no. I mean, sometimes they're made on direct appeal. Not in this case, though. Correct. Essentially, though, the magnitude of the inference that can be made, Mr. Ramirez sold guns to Armenian power. They then used the guns to kill people and kidnap people and extort people. That was essentially the problem. And it's a big problem in this case because of what can be inferred from that evidence. And with that, we would ask that this Court reverse. Thank you. Okay. Thank you. Case target was then submitted. We are going to take — Yeah. Before you sit down, I'll say one thing. Implicit, I think, in some of Judge Kuczynski's questioning, I want to join in with that. While this may end up not being a reversal, the they dirtied up this defendant in ways they did not need to and should not have. Okay. Thank you. Okay. Indeed. Anyway, we are in recess for a few minutes. Thank you. All rise. This Court stands in recess for a few minutes. I'll go over to the bathroom, so I'll check in with you right back. Thank you. All rise. This court now resumes its session. Okay, please be seated. The next case on the calendar is... Delay one minute. I need my glasses. Okay. Okay. I have my pile of glasses here. I often forget it myself. I apologize. No problem. Next case on the calendar is United States v. Alloyan. Counsel, ready? May it please the court, Jessica Rosen with Becky James on behalf of defendant appellant Alloyan. I'd like to reserve three minutes for rebuttal. This case raises a number of issues that require reversal in remand for a new trial. This case hinges on evidence. Seized from an admittedly unconstitutional probation search. Yet the government disingenuously attempts to salvage the fruits of the illegal search based on and after the fact justification of some supposed consent. And this case is also just another example of the government starting up a defendant as Judge Fletcher recognized in the last case as to these defendants in the Armenian power cases. Yet here there were objections to particular evidence as to violence and guns and ammunition in what was really an attempted bank fraud and identity theft case, which had absolutely no allegations of violence to those charges. Could you focus on the consent? That is to say, I understand the argument is that this was not a valid consent because it was coerced. Yes. Could you make that argument? Yes. Here the facts remain that at least at the time of that search, the Glendale Police Department specifically stated at the time of that search and in their declarations in support of the government's opposition to the motion to suppress, that they were there to do a probation compliance check. And ultimately, once they encountered Mr. Eloyan's girlfriend, Ms. Stefanoscu, they specifically stated, we're here to see Mr. Eloyan. He's on probation. I need to speak with him. At that point, she said, OK, or I don't know if she said OK, actually, because the officers stated that they were not sure how she said or expressed the consent. But according to them, she verbalized some form of consent. She gave assent. But it's all just based on legal conclusions with no supporting facts of consent. At what time of day was this, 9 in the morning? About 9 in the morning. The officer said 9.30 in the morning. And how many officers? There were seven officers, uniformed and armed. And while we do not argue that they had guns drawn, they did. Was this an apartment building? It was an apartment building. So they were in the hallway outside the door? I unfortunately don't know fully exactly how the apartment building looks outside that door. I understand there might have been a railing. But it didn't appear, at least from the testimony, that there was tremendous space, if you will, outside of the apartment. But again, I don't know for sure of that. What the government did admit as an exhibit was the layout of the apartment itself. How good is the record in terms of how many of those officers she could see at the time she? The record's not extremely clear on how many she could see at that time. She did not testify at the motion to suppress hearing. But we have no testimony from the officers that say, well, I was the only one there. The other six were waiting in the parking lot. Absolutely not. OK. The government seemed to, I guess, impose, if you will, that she might not have seen them all. But there's no direct evidence or statements by the, I don't believe there's any direct statements by the two officers who did present or provide declarations and testimony that there's no way she would have seen them. And ultimately, according to Detective Contero, who had spoken with Ms. Stefanoscu, according to him, he said, I didn't ask if I could come in, if I and the other officers can come in. Which to me would indicate she was aware there were a number, if not the seven officers, with him. And so really, by beginning the encounter with Mr. Loyne is on probation, I need to speak with him. He, Detective Contero, implicitly asserted some form of lawful authority of, I'm going to speak with him given his probation status, regardless if she consented. Now, of course, Detective Contero? But she did consent. To the extent that we would say she consented, it was not voluntarily. It was coerced. It was based on the Glendale Police Department's show of authority of, I'm here for this probation compliance check. Your boyfriend is on probation. He said, may we come in? He's on probation. Given that. She couldn't. Is there anything that would prevent her from saying no? Nothing in the record, I guess, indicates that there was a thing that showed she could say no. The judge, the district court did state, I didn't find guns drawn or them pushing their way in. But given that up front, they said, we're here to see Mr. Loyne, or excuse me, speak with him. Or we need to speak with him. It wasn't even, we would like to speak with him. We need to speak with him. He's on probation. It really tends to indicate she doesn't have a choice. Well, why? I mean, they're saying, may we come in? We're from probation. We have a legitimate reason. We're not just, you know, here's what we need to talk to him about. She could have said, she could have said, well, if you need to talk to him, I'll send him out here. She could have said that. And to the extent the court determines that it wasn't at least a coerced consent, the officer's conduct, once they entered the apartment, it exceeded that scope of entry specifically. Isn't that a district judge's job? To determine stuff like, was it coerced? Was it not coerced? I mean- Not necessarily. The facts in and of itself is based on clear, but now certain, there is the standard review for, it would be de novo as to what certain conduct might give rise to coercion or to be appearance of coerciveness. I'm not sure I understand the distinction. I apologize. I mean, if we, if we, if we grant you that, yes, saying on probation could be coercive or the circumstance could be coercive, why isn't it all washed away by the fact that district court found no coercion? I mean, he trial fact, looked at the evidence, made a decision. If we find that she validly, voluntarily consented to the consent of the district to their entry, he did state, may I enter, that did not give them full right to then walk in and do a protective sweep. And she twice objected to any search yet. And there was no indication that other people- Wait, wait, wait, wait. You're now going into the question of what happens once they're in. We have been just talking about, can they step over the threshold? Our position is- I'm wondering once a district judge looks at the evidence and says, there was no coercion, you're sort of limited to saying there's not substantial evidence to support that. And I don't hear you saying that. I think I hear you making sort of a jury argument. You're trying to get us to de novo, make that determination. But we can't do that, can we? Well, at the very least, I would concede that there's no, there's no evidence to show that there was some form of express coercion, but implicitly is where the district court erred in finding that there was no coercion, because he did state- The number of officers alone didn't give rise. Because your time is running. So let's tiptoe over the threshold now with the officers. What did they do that was beyond the consent that you dispute, but the district court says was given? What did they do? I mean, they walk in and in plain sight, they see all sorts of stuff. And that's the problem. That's not what the record states or shows. And while the government, in its answering brief, and again, in its 28-J letter, frames it as once the officers obtained consent and were lawfully inside the apartment, they detected the odor of marijuana and observed marijuana and ammunition in plain view, leading them to obtain a search warrant. But that is absolutely not what happened there. If you look at the declarations of both Detective Quintero and Officer Jimenez, they state they gained entry, and Officer Jimenez, who was the one who said, I saw in plain view the marijuana and other contraband, he first checked- He first, quote, for safety reasons, we checked the two bedrooms for additional people. They searched that apartment. And then, I then stood behind the kitchen counter while other officers spoke with Eloin and Stefanescu. It wasn't just that we walked in and happened to see in plain sight. So at the threshold, that would be a pretty difficult argument to make if they saw it in plain sight at the threshold. So where were these things found? In the kitchen behind the counter. And there were exhibits of pictures of the kitchen. And while, yes, you walk in, you have a dining room, a kitchen, there's no specific full walls. There is pony walls. It's not necessarily you walk in and you would just see it. Now, of course, I haven't walked in the apartment myself. But I find it hard to believe that, A, they saw it in plain sight because their declarations do not say, I saw it when I walked in. It was only after they walked around the apartment. And then with the seven officers, of course- Let's grant you that. Okay. That they don't see it. I don't think anybody has claimed that they saw it when they walked in. Well, according to the government, they said once they were in their entry, they saw in plain sight ammunition and marijuana, which was not the case. Or at least it's a slightly more complicated story. Thank you. Yes, it is more complicated. Let's take the more complicated story. Let's say they walk in, and then eight of them or seven or eight of them, and they start walking around the apartment. So what? The only thing that Ms. Defnoscu had consented to was entry. They stated specifically, we're here to see Mr. Alloy, and he's on probation, and we need to speak with him. To the extent that we say it was valid consent, which, of course, we can speak, they went in to speak with him. Once they walked in, he walked out. They saw him. He was there. There's no facts to state, well, there must be danger. There could be danger. I see my time is up if I may continue. Okay. To the extent that- I'm trying to tease out what the legal principle is here. They walk in, and she hasn't said, feel free, walk around the apartment, make yourself at home. But she hasn't said, but- Well, she twice said, I do not give consent to search my apartment. I understand. But we're past that point. Okay. We've had that discussion. Yes. Okay. You're not going to- I mean, I guess in a way, the fact that- Why don't you let me ask the question? Okay, I apologize. You know, so the other part, she doesn't say, by the way, stay by the door. I'm not letting you go past the door. And they do what police do, which is to sweep around and start snooping around the corners. But that's in violation of the Fourth Amendment if there's no reason for the sweep. Why is that? Well, this case law, this circuit's case law is quite clear. It still is really with the U.S. She has consented to them entering. To entering. She twice objected to any search. Yet, nonetheless, they come in and- Well, they haven't opened up any cabinets. They haven't. I mean, that's a search. I mean, you're saying that- Living in other rooms would be a search, wouldn't it, if there was no consent to that and no warrant? Wouldn't that be an unreasonable search? I get to ask the questions. It's my first time. I apologize. No, that's all right. But, you know, so let's say that- I mean, I understand if they open a door and they walk into a bedroom, there's a door locked or something like that. But what prevents them from walking, you know, sort of fanning out and sort of looking and peering into open doors and all that? I'm not sure where the constitutional principle is there. Well- I mean, when you invite guests in your apartment, you know, friends, do you sort of say, you know, you can only go to the places I specifically gave you permission? Can't go to the bathroom, can't- Were the police friends? I do tend to agree with Judge Fletcher there. The problem is, is exactly, the police were not friends. I mean, this is- It's just a protect and serve, right? Yeah, but the law is quite clear that the officers without a warrant can at the very least conduct a minimum protective sweep if there is either A, if it's intended to arrest in some circuits, though this circuit has not said this, if at the very least there's reason to believe that there's danger or safety, but the government specifically says we do not argue there were extended circumstances. The only thing the government proceeds on saying why the search and subsequent warrant based on that search was valid was because she consented to their entry. And they did- Some movement, but it's- It may depend. If they're sort of close friends, I mean, if they are, how should I put it? Overnight guests, for example, they would have access to the bedroom, whereas you wouldn't invite dinner guests, dinner guests wouldn't feel free to go into the bedroom as I would, you know, normally. And maybe police are less than friends, but there's some degree of freedom to walk around, there are eight people, they can't be confined to the- Which is also problematic. If this is truly just to come and speak with a probationer about his probation status, why did we need seven officers? I mean, it almost feels like an attempt to say we're going to place these officers in places. It was a bad move on Ms. Stavonescu's part to invite them in, to consent, but- Two of them. She did anyway. I mean, the district court found that. And we have to assume for purposes of this discussion that she let them in. There's some freedom of movement that they have. They can't just sort of be, sort of sit like birds on a branch, sitting there by the door. Do we know what you can see from, you know, sort of a reasonable space that eight people would occupy coming to the apartment? What of those things you could see that they said this was- I mean, for example, let's take the scent of marijuana. They say they smelled marijuana. They would have smelled that even standing at the door, right? Yes. Why isn't that in itself? They walk in, they smell an illegal substance. Why isn't that cause enough to start looking around? Why doesn't that free them of any- Well, this court's precedent in United States v. Reed specifically says the odor of marijuana alone does not give the facts or does not provide the facts necessary to then conduct a search. And so, I mean, that alone, and it's arguably with today's age in marijuana, but regardless of that, is that there needs to be something more than just the scent of marijuana. I mean, that's- United States v. Reed, if I'm correct, was, I believe, 2006. So this has been on the books for a good while, that that alone will not give enough factual support to provide that they can then go search the remaining property. And I mean, it wasn't just them stating we need to stand around- Well, why isn't it enough for them to sort of fan out and start looking? Potentially, you know, potentially that could be enough. But the thing is, on the facts here, we don't know if they would have found themselves in the kitchen when they were just walking and fanning out. They specifically undertook a protective sweep once inside, even though both Ms. Stefanoski and Mr. Alloyne were in their presence and then chose to go behind the kitchen. Whose burden was it to establish those limits? Excuse me? I mean, if you object to them going in the kitchen, for example, why wasn't it defendant's burden to say, look, the kitchen was not within the reasonable scope of the consent? And here's what you could see. And here's where you have to stand to get into the kitchen to see what's in the kitchen. And this is beyond the scope. Why isn't that the defendant's burden to provide evidence? Well, here, when defendant moved to suppress all evidences due to this search, the defendant moved on the basis that this was an invalid unconstitutional probation check, which ultimately the government conceded there was no probable cause to believe he resided there. So in their opposition, they presented their exception consent. It was their burden to prove that the consent was effective to overcome an unreasonable search and seizure. And to the extent the court, the district court... And they say, we got the consent, so this is not a probation search. They say, we got consent. And this is Judge Bizer. Why isn't that the burden at that point of the defendant to say, but they went beyond the scope of the consent? You know, this evidence that they say is in plain sight, you could only see it if you walked into the next room. And they went, the consent didn't extend that far. Why isn't that the defendant's burden? I think at the end of the day, considering it was quite clear that she only gave consent to entry and twice objected to any search. But I don't know standing here or sitting here that when they went in and they sort of stood there, would reasonably would expect eight people to stand that you couldn't see into the kitchen. And the record doesn't supply that and the government did not present that evidence to show... Why isn't the defendant's burden to say, look, if they came in, all the stuff they see, they claim they saw in plain sight was not in plain sight. It was somewhere where they had no business in walking. If that was the record, then we could be in a different situation. But the fact remains is that they walked in, did a protective sweep and then placed themselves in a particular spot. So the record, nor do I know whether they would have seen that in plain sight. And ultimately, they did not say once I walked in, I saw it in plain sight. And that's where it really becomes problematic and really becomes an unreasonable search and seizure, even if the consent to their entry was valid. And with that, I will... We'll hear from the government. Good morning, Your Honors. May it please the court. My name is Allison Westfall-Kong and I represent the United States. I'll start by just answering, I think, one of Judge Fletcher's questions regarding the number of the officers. It's true that there were seven officers, but I would just point out there was testimony at the suppression hearing at excerpts of record 411 that all seven officers weren't congregating at the door when they saw the officers. But could you give me that testimony exactly? Yes. So... Is it 411? Excerpts of record 411 at lines number 10 through 12. I wasn't the only one that was discussing or having a conversation with... Who was I? I believe this is... Let me just make sure. I assume it's not you. No, no, no. I apologize. It's either Officer Quintero or Officer Jimenez. Mr. Geragos. Oh, no, but Geragos is a lawyer. Geragos is the defense attorney. Is this an officer? Who is this? Yes, it's an officer. It's either Officer... I believe it's Officer Quintero, because I believe Officer Jimenez was the second officer. And so the testimony was all seven officers weren't congregating at the door. Okay, but on the previous page, in the middle of the page, line 14, seven officers at the door when she opened the door, you said she stepped aside. Is that your testimony? Correct. That's true. And so I think that he's clarifying... So seven officers at the door and she steps aside. I mean, there are two things in there, but he doesn't object to either one. He says, correct. So at the door and congregate around the door may be a little different, but it sounds to me as though it's pretty likely that seven officers would have been visible to her looking out the door. The district court specifically found that it wasn't clear whether she could have seen all the seven officers. That was the finding that was made. But I don't think it's a significant point. I'm just pointing out that there's at least... Actually, it might or might not be, and it cuts in two directions in my view. If there's seven officers in uniform at the door, she sees them, and she then hears one of them say, we're here to do a probation search. We need to see so-and-so. We need to come in. There's a fair amount of coercion both to the statement and to the number of officers. And that, I think, cuts against the government. On the other hand, if there's only one officer visible and she gives consent, that, I think, may hurt the government in terms of what happens after they come in. Because if there's seven of them and she gives consent, they're going to have to stand somewhere. And someone might end up in the kitchen just because it's a small enough place and they scatter. So which way do you want to lose this one? Or rather, which way do you want to win it? But do you want to choose as to whether she knew there were seven or whether she didn't know there were seven? Well, I can't choose because I can't make up the facts. I do think it's probably fair, given the testimony you just cited, that the seven officers were... Maybe they weren't congregating at the door, but they were outside. They were not kind of hiding in parked cars. I don't think that in itself would be... Seven officers at the door when she opened the door and you said she stepped aside. Is that your testimony? Correct. At the door. Okay. Yes. I think he later clarifies that they were not congregating there. Ultimately, I don't think it's a significant point. I don't think, as the district court found, the fact of seven officers in itself was not so coercive as to undermine her voluntary consent. And I just want to... In my view, the coercion, if we were to find coercion, really is the statement that we're here to do a probation search. We need to see this guy. We need to come in. And then she says yes. Well, so let me just briefly correct what you said. They didn't actually say we're here to conduct a probation search. The testimony was, you know, we're with Glendale Police. Is the defendant here? She said yes. Then they said, we need to speak with him. He's on probation. And then they asked, may we come in? And she said yes. Or something to the effect of, sure, go ahead. And then she stepped back, opened the door, and left. And you can point me to it. Is the testimony that said, may we come in? Or did they say something else? Well, so I believe that my opponent is correct that in the declarations, they said, need to. But the testimony at the suppression hearing was, may we come in? And let me get that. So when they have a chance to think about it and write it down, they say, need to. And then when they're on the stand a little later on, they say, may? Well, I don't think it's significantly different, whether it's need to or may. But I do think the live testimony that was actually elicited in the officer's own words, you know, there was no involvement of the assistant United States attorney in preparing the declaration. And you're saying the written document is not the officer's own words? Well, the officer obviously adopted it as his testimony. Yeah, OK. I don't think it really matters, though. Even if, whether it's, you know, we need to speak to him. He's on probation. May we speak to him? He's on probation. That in and of itself is not. What's the standard in terms of whether we were, the legal standard in terms of whether it's coercive? How's that articulated? So this court has consistently held that in determining whether consent was voluntarily given, that is for clear error. I believe that in the Shiloh case, the court held that to the extent that you're making a general rule about what actions can and cannot constitute consent, that might be de novo. However, the government would contend here. No, I'm asking a different question, not standard or review. But what is the standard in terms of determining whether or not it is coercive? Well, I think. How's that articulated? I think it would be similar to, you know, the standard as to whether somebody is seized and such that they. Would it be, for example, would a reasonable person in her position understand that she has a choice? I mean, is that how it's articulated? I think that it's whether a reasonable person would understand that she was free to leave or free to, you know, reject the request. And I would just point this court to its decision in, I believe, Piaton Soriano, where there the court affirmed voluntary consent, even though there were five or six officers in this motel with this woman. The woman repeatedly said, I'm unsure as to what to do, as to whether I should grant consent. And one officer even suggested that if she did not sign the consent, her children might be taken away from her. And so this is, I think, a far cry from that situation where the court affirmed the district court's determination of voluntary consent. And so the district court did not clearly err in crediting these two officers' testimony that she provided some form of verbal consent. She also impliedly consented through her actions by stepping back and opening the door all the way. And the government's position is that every other kind of claim that has been raised on appeal was simply not raised in the district court and is procedurally waived. Yeah. In terms of clear error, any factual finding by the district judge based on a determination about as to disputed or unclear facts, we obviously have to respect. But if the question is not what happened, but rather the legal consequence of that, what happened, I'm not sure that we review that one for a clear error. Well, I would just know that this court has consistently framed it as in determining whether under the totality of the circumstances it was voluntary consent. That is reviewed for clear error. So given that, I don't know that you could go against that. But in any case, I think the circumstances here are a far cry from many other cases where this court has found voluntary consent. And the guns were not drawn. There's no evidence that the tone was anything but cordial. And she certainly was not a suspect. They clearly were interested in talking to the defendant. So I think that also cuts in favor of consent. So I don't think there was any clear error. Now, once they're in the apartment, they've raised this issue of the protective sweep. And I would just point out again, there was no challenge to this below. And so my opponent actually referenced the fact that there are facts we don't know. We don't know whether they still would have been standing in the kitchen after the sweep. We don't know what exactly they would have been able to see. And the government submits that that's because the defendant didn't raise that claim below. And so the government was deprived of the ability to introduce that evidence. In any case, if your honors look at excerpts of record 344 and 346, the kitchen is immediately to the left of the doorway. The jars of marijuana, they're clear jars, clear plastic baggies. There's a clear bag of ammunition. And so in looking at... So ER what? So ER 344 is a floor plan, I believe. You know, somebody messed up these ERs, that the ER numbers are stamped over each other. So they're not visible. A little hard to... So they also needed the picture, which is 346. Who prepared these ERs? I believe they're the defendants. Do you have the same ERs either? Are the numbers sort of messed up so you can't see the numbers? I have just a couple of pages, but there's the 344 is what it comes about. Well, the problem is I don't know how to get to 344 because of the numbers around it. I mean, I have about 10 pages. But okay, here we go. When you get numbers like that, you need to fix them. 344, okay. And to be clear, these are not photographs or diagrams showing where exactly the evidence was, but there's a picture that shows the apartment, shows where the kitchen counter is relative to the door. That's excerpts of record 346. Admittedly, the number is not that clear. But if you go to 345, there's a cover page, Exhibit 2. Yeah, I see 345. 344 must be in the prior volume. So I think 346 is actually more helpful. The door in 344 is the front door to the apartment? I'm sorry, on 345. There's a white door in the middle of the picture. I apologize. I have to get that specific excerpt. But could you look at 346? Yeah, I'm looking at 346. So 346, I think the white door is the front door, Your Honor. I see. So when you walk in the front door, if you're standing there, you are basically standing in the kitchen. Correct. There's an open floor plan. Okay. Correct. So the point where they can't show that, any protective sweep or bedroom search caused the officers to see these items. And do we know, as far as the record is concerned, do we know where in the apartment they saw these things in plain sight? Or they saw them? They were on the kitchen counter is the testimony. In this picture, this picture was not taken at the time of the search. So. Right. I mean, obviously. But the kitchen counter was visible in 346 on the right-hand side of the picture. Yes. And I believe. So that would presumably have been visible by a single officer. Yes. Yes. And if they're on the counter, it sounds as though they do not need to be actually in the little kitchen area to see it. If it were behind the counter, they might have to be back in behind it. But if it's on the counter, it should be visible actually from the rest of the room. Yeah. That's true, Your Honor. Are there any other questions about the evidentiary issues or the sentencing issues? No, not for me. Thank you. Thank you, Your Honors. Okay. Well, you're out of time. Would you like a minute for a bottle? First, I'll apologize for some of the excerpt numbering. And just real briefly, just to start off with the photos of the kitchen. First and foremost, we don't know exactly. They said it was on the kitchen counter. If you do look at those kitchens, it's not one flat counter. There's multiple parts and not 100% sure where that might have been. So it's not so clear cut that they could have walked in and seen it. And as the record shows, they did not walk in and just see it. It occurred after they did a protective sweep and then placed themselves in the kitchen. So it's not clear that it would have been in plain sight at that front door. Where are they going to stand if they're coming through that door? I mean, it looks like a completely open space, which includes the kitchen. Where are those eight guys going to stand? Well, technically, there's a dining room to the left with some chairs, and there is a living room as well. I know we're focusing on the kitchen. You objected that they stood there. I mean, it's open space. Why would they stand on one side? Why is it legitimate for them to stand on one side and not the other one? I mean, they have to stand somewhere. They do. But again, do they need to walk into the kitchen to stand? There is an ample living room and dining room area as well. Why would you stand one place or the other? And wherever they go, if they find something you're going to say, they didn't need to stand there. But I think you need to say something more than that, that it was somehow illegitimate for them to stand on this side of the door as opposed to that side of the door. And I'm not sure what that argument is. Well, I think here it ultimately it's all speculation, because given what occurred in that apartment, we don't know if they would have seen it had they stood somewhere near the front door in the kitchen. But I'm having trouble seeing any scenario of what happened once they walked in that is not legitimate. They have to stand somewhere, right? There are eight of them. They have to stand somewhere. And I am trying to give you the benefit of all the doubts and point out to me what could have happened here that was illegitimate. They decided to stand on the kitchen side. Why is that any less legitimate than having them stand on the living room side? Well, again, looking at the photo of the kitchen, it's not clear exactly where, aside from the officer saying on the counter, where it was found and where if it really would have been so visible had they even stepped foot in the kitchen or did they need to look near the refrigerator or anything. But in any case, back to our first point, is that we don't concede that there was any valid consent at any time. And ultimately, that it would have been, that it was the result of coercion, though not necessarily expressly or pushing their way in, but by implicitly showing some form of lawful authority that they had the right to be there and that they could go in because he was on probation. And also, it is always the government's burden to prove that this warrantless search was reasonable, even if there was the consent to the entry. And yes, just to touch upon real briefly, in United States v. Shibu, the court did state what the court is considering as a general rule what might be coercive. It is Rubu Dinovo. And the defense is not real. It does not dispute. The factual findings. We're disputing whether the factual findings really did amount to consent. And with that, I submit. Thank you. Thank you. Case is filed. Sentence submitted.
judges: Kozinski, W. Fletcher, Gould